May it please the court, my name is Karen Persaud and I'm here today on behalf of the trustee for the Adyar Litigation Trust, the plaintiff in the court below. This case requires reversal for a very simple reason. That is because the district court struck the jury improperly here and it only takes you two steps to get to that conclusion. The first one is if you look at just the claims against Mr. Dirksen, those are legal money damage claims that require a jury. The second step is, if you look at what the trial court did, he took the solvency finding that he made and he used that to dispose of every claim against all the parties. Therefore, every claim against every party requires a jury trial. So that gets you to a reversal. But I also would like to talk today about the solvency finding. You waived the claims with respect to Mr. Dirksen. Pardon me? You waived the jury claim with respect to Mr. Dirksen. You didn't present that when the court asked you to come forward with your, you didn't raise that until the motion for reconsideration. Isn't that right? Or have I got it wrong? I may have. God knows it's a challenge getting through all this. It is complicated. But what happened was we had a petition, a complaint that had claims in it. They moved to strike that primarily on contractual jury waivers. They also primarily moved on fraudulent transfer. And then they put a footnote about breach of fiduciary duty. That's what was in the motion to strike. We then amended, we answered it the same way. We answered contractual waiver, fraudulent transfer, breach of fiduciary footnote. We amended our petition. We added promoter liability on just enrichment and alter ego. They never modified their motion. They never moved on those claims. So then when the judge issued his order on the original motion to strike, he looked at the petitions together and he didn't see our footnote response to the breach of fiduciary duty, which was the only claim. He saw it, didn't he? I thought he talked about the footnote. He saw the movement's footnote, but he thought that we had not responded when we had by footnote as well. And we provided your honors, the Fifth Circuit's opinion in Ray Jensen, which does hold that we are entitled to a jury trial on breach of fiduciary duty. So then we moved to reconsider and pointed out that he had not, the judge had not seen the footnote and pointed out the other reasons that the claims that hadn't been moved on, how they were legal money damage claims. And if you look at just Mr. Dirksen, that entitled us to a jury trial. So we did put that forward and moved forward as we could. But you also have to remember, your honor, the way you put in a motion response, what you do is you demand a jury and then there has to be an intentional, knowing relinquishment of that right. And there's lots of cases about that so that you can preserve your Seventh Amendment right. And it's hard on this record to say that the plaintiff hadn't tried to do everything possible when there's responses to the motion, there's motion reconsideration, there's a mandamus, there's a motion to clarify the record, there's a motion to amend and certify. I mean, every step of the way, the right to a jury trial has been asserted. There's nothing in the record that indicates an annoying, intentional relinquishment of the jury right. So that's the standard we apply when a lawyer drops a stitch? I don't think so. Well, you're going to shift the burden, what you'd be doing then would be shift the burden from the... No, we're not going to shift the burden. But I'm saying that it's a different, to say that you have to have annoying and intentional waiver of a jury right is a different thing from saying the lawyer didn't make the case. We have a case in this circuit, which I don't know if I would sign on to, but it says you can't make an argument in a footnote. So I don't know. But anyway, I don't want to take all your time on that. But the rules do just require you to demand the jury. That's really . . . The problem is once demanded, so that's fine. But then once the motion to strike was made, then the question is what level of response do you have to make to the motion to strike and all that? I think that's what we're getting at. It doesn't have to do with originally whether you waived it. It has to do with whether you made the appropriate arguments in response to a motion to strike the jury. We responded to exactly the arguments that they made in the motion. Which is in a context, I mean, we're not talking about just any old case. I mean, you all cited a bunch of employment cases about legal and equitable remedies and all this. This is a bankruptcy case. And in the context of bankruptcy, it's not unheard of that we don't have jury trials on stuff. So the context in which all this is being filed, in my opinion, is a bankruptcy case. It's an adversary in a bankruptcy case. And that is a context in which striking juries is not unheard of. Well, and that was one of the issues that they briefed in the body of their motion was the Langenkamp issue. And that was definitely a joined issue and the district court disagreed. And that was part of our motion for re-hearing as well, to point out that he had made a mistake in our opinion on application of the Langenkamp opinion to this case. So to say it was bankruptcy, yes, but that was the issue that they raised and that was joined issue fully. All right, let me ask you this, because this gets back to all these employment cases that were cited. You state this legal proposition that once anyone in the case is entitled to a jury on any issue in the case, then the whole thing has to be tried to the jury. And then you cited all these employment cases that dealt with different remedies and claims with the same parties. So John versus Jane having a right of injunction, also having a right for money damages and so on, and that those need, if any of them are to go to the jury, they should all go to the jury. I just don't see that as fitting here. I mean, to me, that doesn't have anything to do with this. Was it not proper for the judge to try Verizon versus IDARC or IDARC versus Verizon? And once that's tried, then you can see what's left and what might need to be tried against Dirksen. And if the contractual waiver was valid, and I know you don't think it was, but let's say for argument, it was, then why isn't IDARC versus Verizon subject to a non-jury trial? And then if you have something left to be tried, maybe Dirksen gets a jury trial and maybe he doesn't. We can analyze that. But that's down the road, much like that's how we work arbitrations. There's a part that goes to arbitration. We send it. We stay the litigation. Then we come back and see if there's anything left to try. Why wouldn't it work the same way here? Well, I think there's two problems with that. One is the claims against Mr. Dirksen. One is breach of fiduciary duty. That's also against Verizon for aiding and abetting. So those are completely overlapping, as well as the joint and several liability on the promoter liability claim. So you can't just do Verizon and then do Mr. Dirksen. It just doesn't work that way. And the second thing is the United States Supreme Court says you don't get to do equitable first and then whatever's left over, do the legal because that's the way that- None of these are cases that are even remotely similar to the factual and procedural pattern here. I mean, I went and looked at those because I'm like, is there a case about this? And there are all these employment things where we're talking about the same parties who have different causes of action, some of which give legal remedies, some of which get equitable. We're not dealing with a situation where you have a bankruptcy case with a main player being Verizon against another main player being IDARC and its litigation trust, and then you have these other potential players like Dirksen and so on and so forth whose liability- I mean, Dirksen's liability in part depends on whether IDARC was a subsidiary of Verizon. That seems like an IDARC Verizon issue. Once you decide they're a subsidiary, then his fiduciary duty changes and is a much different one than if we're just talking about many cases that were remotely similar to this case that stood for this proposition you were announcing. But help me, if I missed it, I want to go back and look. I don't think this is a party case, but in Enright Jensen, one of the things that the Court was looking at was there was a damage claim and there was equitable issues. Torture interference, actual damages, and then there was an accounting and constructive trust, and this Court refused to say all bets are off, we're going to check this equitable stuff first. The Court said, no, we're going to look at the nature of it and get a jury trial on the actual damages. So you weren't denied a jury trial just because there were equitable issues in the case. I know, but let me come at it this way. Are there any cases where, again, this is assuming the contractual waiver was valid, and I know you're disagreeing with that. I'm not having you give that argument up. But assuming argument it was valid, do you have any cases similar to that, where one party, A versus B, they've waived a jury, but there are also potential claims against C, and they said, well, if C has any possibility of a jury trial, everybody's going to be tried in front of a jury on everything, and this contractual jury waiver just goes out the window? Well, it may not be that the entire claim is submitted to the jury, but to the extent that they're overlapping common facts and on part of those, you require a jury, then what the United States Supreme Court has said is the way you protect that is you do the And that, which case do you think is your best case, closest to our facts and our procedure that you're hanging your hat on, this U.S. Supreme Court case? Which one do you want me to hang my hat on? I will go back and look at them, but the ones we cited are Dairy Queen, Beacon, and Little. Okay. Well, the other thing, Your Honor, is when you say that, well, if this is fraudulent transfer is equitable, then we should do that first, and then we'll go figure out the other part. We don't think that the fraudulent transfer claim here is equitable in a resolution. To get there, what the district court did and what the defendants convinced him to do was to look at the proof of claim in the bankruptcy court, but here, that private right legal claim for fraudulent transfer was brought by litigation trust in the district court. Wait a minute. It wasn't brought by the litigation trust originally, was it? The litigation trust didn't exist. I mean, this is a claim that, as I understand it, it's the debtor's claim. The debtor transferred those claims. Yeah, and it migrated. It got transferred, and this is not at all uncommon, as you know, it got transferred to this litigation trust, but it's the debtor's claim. But when it got transferred to the litigation trust, what happens in Langenkamp is what is equitable is because it's part of the claims allowance process. So you have a claim, somebody files an objection. One thing here is what happened is these got transferred to the litigation trust before an objection even got filed. But the way the claim then was, at least one of them, there were four of them, the way one of them that I paid particular attention to, and it may be some of the others, was ultimately resolved, it was to say that if there is a recovery here on the fraudulent conveyance claim, then the claim will be reopened in the bankruptcy court. So the claims process takes into account, to this good day, the fraudulent conveyance cause of action, as it would have to under 502 D. You can't just blow it off. Somebody's got to deal with it. Well, IDARC has also gone through another bankruptcy by now, but what Stern says is that— Yes, that happens. What Stern says is it has to be necessarily resolved in that process. So in other words, by doing the claim and the counterclaim, the fraudulent transfer, they're necessarily resolved, and there's no way that the indemnity type claim, which I think is the one you're referring to, about representation and registration statement would ever resolve claims against Verizon for breach of fiduciary duty as a promoter or illegal dividend. Well, 502 D says you can't—502 D makes the resolution of this fraudulent transfer claim a condition to the resolution of whatever the regular claim is pending in the case. You can't go ahead and resolve the claim that's been filed in the case until this fraudulent conveyance thing. And this whole thing was set up to honor that. I've never been big on litigation trust, but this is a sort of classic case. It's not got all the refinements that we've thought of lately. Well, Your Honor, if you look at the test in Stern—I mean, Stern may have been set up that fraudulent transfers are not triable in a bankruptcy court. There's an Article III question out there. That's an open question. It might get answered in Bellingham. But Stern says that it has to be necessarily resolvable as part of the claims allowance process. Doesn't 502 D have that effect? Well, but courts do it all the time. I mean, the bankruptcy court can lift a stay and let something go forward in state court and then resolve it. They can withdraw the reference so that the trustee can go forward in the district court and then go back and resolve it. Because it has to be resolved at some point doesn't mean that it will necessarily be resolved within the claims allowance process. Well, I understand your point. But this court, this bankruptcy court—I guess it was a bankruptcy—was very careful about saying, this claim is resolved unless the fraudulent transfer claim is somehow successful, whereupon I'm reopening. It's not over with. So you know, the question is, is that close enough for government work? Well, but if that's— Your answer is no. My answer is no. Yeah. My answer is maybe. And the other thing is that there's no proof of claim against Mr. Dirksen in bankruptcy court either. So those wouldn't resolve the claims against Mr. Dirksen, couldn't resolve them. Let me ask you about Dirksen because way down the line—I mean, there's a lot of reading to do that the judge wrote. But way down the line, he says something to the effect of, and you know, this breach of fiduciary duty is kind of flaky anyway because you haven't really tied this $9 million to anything Dirksen did. And I wondered, you know, does it—you don't get a jury trial on nothing, whether you would otherwise get it or not. So what is it that Dirksen did that caused $9 million in damage? Well, several things. This is a corporate spinoff where they're spending the stock of IDR to the Verizon shareholders. To issue shares of stock, you have to have a board of directors. And what they did here in the bylaws— This gets into your Delaware law claims, right? Right. Okay. Go ahead. Talk to Judge Haynes about those. Well, what did he do? What they did was they acted as promoters in setting up this company. And if you look at the cases—because what you were talking about a little bit earlier, Your Honor, was the whole Anadarko-type argument where you don't owe a fiduciary duty unless it's insolvent. Those are different. First, that's part of the problem here is they didn't do what they needed to do to set up IDR to be a corporate subsidiary of Verizon. They don't have a board. The board can't authorize stock if there's not a board. They didn't set a price. They didn't prove that they paid for it. There's no contract to buy this. So they just purported to act. That doesn't mean that they're a wholly owned sub whether there's insolvency or not. That doesn't mean they're a wholly owned sub. So you don't go there— You're not saying there was never a board. Pardon me? You're not saying there was never a board, are you? There has been a board approved subsequently, but at the time that they were acting as a promoter, there was not a properly constituted board because it required two parties to be directors. At some point, there was a board. At some point, there was a board. And the board ratified some actions that occurred prior to the board, I guess, being formed. Well, after the spin, right before the spin, they tried to get two of the board of directors for the new board to sign a consent that would authorize Coticchio's authority to sign the distribution agreement. Those parties, though, however, when they got appointed after the formation of IDR, or after it was spun—well, not the formation, but after it was spun off, the whole board purported—three of the other new members purported to do the ratification, but the other two never did. So the district court himself held that the new board did not ratify prior conduct on the distribution agreement. So— Was it million or billion? I think it might have been billion. I'm sorry. How much harm did Mr. Dirksen do? Million or billion? Okay, the— In your view? Well, the illegal dividend was the $9.1 billion. Okay. So it was billion. You see, in government, million, billion. But, you know, there are other conduct at issue, Your Honor, because it was more than that. It's the way they set up this entity. In these spins, what they do is they have—this one had a tax-sharing agreement. So it precluded IDR from going out into the capital market for a certain amount of time and doing mergers and acquisitions. And there was a seven-year period where it couldn't refinance debt unless it got an opinion from an attorney. It put these onerous burdens—there were other contracts, but they put the onerous burdens on there, along with the $9.1 billion in debt. Well, there was testimony, as I understand it, that those agreements, which are common, that there's all kinds of workarounds that you can do with respect to them. And they are not the obstacle that they are set out to be, that you set them out to be. I mean, I think there's testimony that the judge could have credited that there's—that's not a fatal— But I think that was a fact issue for the jury to decide whether or not what Mr. Dirksen and Verizon did as promoters on this company was a breach of their fiduciary duty in the limiting itself on its ability to go forward with financing and structuring and whether that was a play part—played a part in the ultimate demise of this company. Did Mr. Dirksen get ill-gotten gains? Is there something for him to disgorge? No, that's why it's actual damages. Okay. So, if the judge is right that there's no link between his alleged wrongful acts and the alleged damages were done with fiduciary duty, because you have to have actual damages unless you're making a disgorgement sort of claim, and you're not making that. But we haven't even tried causation. The judge just assumed that there was no causal— Well, what he's saying is you haven't—you haven't pled, you haven't argued in this sea and bunch of documents and arguments. You haven't really made that link. That's what he's saying. And so, I'm just trying to understand—I don't want to go through this whole gyration about a jury trial and go back and you have a jury trial, and then you get a directed verdict because you don't have any link. So, I just want to—I want to understand the link, and I'm still a little bit lost here. Well, when he's acting to authorize agreements, distributions of $9.1 billion, when he's imposing these agreements that put the company in a position that it's not able to meet it, then there's a question of whether or not that rendered it unable to meet its obligations on a going-forward basis. And if it did, then we have a right to a jury trial to decide how much damage does that cost. Thank you, Your Honor. And you preserve time for rebuttal. Thank you, Your Honors. I represent the Verizon defendants, but I'm also here today presenting argument on behalf of Mr. Dirksen. This Court can affirm Judge Fisch's ruling if it makes the following four findings. First, as we've discussed, that under Langenkamp and this Court's decision in Jensen, plaintiff had no right to a jury trial on its fraudulent transfer claims. Those were pled solely against Verizon, which filed proofs of claim in the bankruptcy, and Judge King, as you noted, those were only provisionally allowed subject to the outcome of the fraudulent transfer litigation. With regard to the non-fraudulent transfer claims, Judge Fisch did not abuse his discretion, and it's an abuse of discretion standard, in finding that plaintiff had forfeited the arguments that it wishes to present on appeal, because plaintiff did not timely present them to Judge Fisch. Third, Judge Fisch did not clear the error, and that's the relevant standard of review, in finding that the value of IDR's business at the time of the spinoff was at least $12 billion, substantially in excess of the debt that it took on as part of the spinoff. Indeed, that evidence, the two-week bench trial, overwhelmingly supported that conclusion, and led Judge Fisch to conclude that there was no evidence supporting the contrary result. And finally, that Judge Fisch complied with Rule 52C, when he found that in light of his valuation and solvency finding, plaintiff's claims cannot be maintained as a matter of law. Judge Fisch certainly did not err in giving plaintiffs, through the order-to-show-cause process, a briefing opportunity that the rules did not even require. If the Court reaches those four findings, it does not have to address any of the alternative grounds for affirmance we set forth in our brief, nor does it have to address plaintiff's challenges to the pretrial rulings, because those were all subsumed by the judge's post-trial decision. Okay. I want to understand the whole jury, because everybody spent a lot of time on the jury question, and I think it's a very fair point to spend a lot of time on. Their argument is, even if this is true, that the fraudulent transfer could be tried to the bench, because in their view, claims against Dirksen are made that are legal, and those have to, in their view, be tried to a jury, ergo everything that could bear upon that, including valuation, that could bear upon Dirksen, has to be tried to a jury. Now, as I said, I struggled with finding a case that said that, and at least as far as what y'all cited, it didn't say that to me. It said claims against a party. It didn't talk about different parties. But it's got some superficial appeal. If we're going to hold Dirksen to the finding, then IDARC v. Dirksen or IDARC Trust v. Dirksen, shouldn't they get a jury trial on that if they're otherwise entitled to it? So what is your response to that? So I agree with you. I'm not aware of a case that is held that in a case where you're suing the main party who you claim did wrong, and then adding effectively a tag-along defendant as to whom damages are limited to pre-existing insurance, now, limited by the bankruptcy court as part of its equitable balancing between the rights of creditors and the rights of the company or the interests of the company that's going to be emerging from bankruptcy. The bankruptcy court says, we're going to not eliminate all claims against the office of directors, but we're going to limit them to this existing pool of funds. So I think that makes this case, you were saying, Judge Haynes, earlier, this is a case about bankruptcy. And it's not uncommon at all for them to be in bankruptcy. Now, if there were a legal claim against Mr. Dirksen, could it be tried to a jury separately? I'm not aware of a case that's on point one way or the other. But I guess I'd like to start before that question, which is first, plaintiff's arguments that their claims against Mr. Dirksen ought to have been tried to a jury simply weren't presented to the judge. They weren't presented other than a short footnote that got the law wrong in the Fifth Circuit. Okay. Well, we've thrashed around with that a little bit. I guess I would rather understand, do these Supreme Court cases that are dealing with these employment cases and the one tortious interference cases, whatever, do they require that whatever might should go to a jury be tried first to the jury, and then you deal with anything else? Or do they allow the process that was engaged in here, which is IDR Trust versus Verizon, on fraudulent transfer, either under contractual waiver or under the theory of it's equitable because it affects claims processing, we're going to try that one first, non-jury, and then we'll see where we're at? Well, I guess, let's be clear, I don't think that's an accurate description of what happened here, Your Honor. Okay. Judge Fish concluded that plaintiff didn't have a right to a jury trial on any of its claims. Right, but some of that relies on this murky, did you brief in, the footnote and all that, which I'm just really not excited about that being the fulcrum of the case. It may end up being, and whether I'm excited about it or not doesn't matter, but I'm just hoping that there's some other analysis here from one side or the other. If the court were not inclined to, you know, were to find that Judge Fish abused his discretion by holding plaintiffs to the arguments that they raised in a timely fashion, I think the next issue that comes up before the court is the question of harmless error. Because again, Judge Fish did try the valuation issue because he recognized that plaintiff really has one claim, they pled under 11 captions, but their one claim is that the business that Verizon spun off was worth significantly less than the debt that it took on as part of the trial. It was found after the two-week trial that there was no evidence to support plaintiff's valuation conclusions, and there was overwhelming evidence that supported the proposition that it was worth at least $12 billion and likely worth $12.8 billion based on the price on the New York Stock Exchange, which is at $26.25 on the day of the spin-off, went up to $37 a share by May of the next year and was still above $24, yielding a $12.5 billion valuation in November of the following year. So this was overwhelmingly shown to be a solvent company. That cuts the heart out of all of plaintiff's claims. There would have been, I mean, under Rule 50, the inferences from the facts so overwhelmingly and strongly pointed in one direction, the defendant's direction, that this is the kind of cases to which any error as to the jury trial would have been harmless. Well, their argument is, though, that Judge Fish is the person who decided that value question and that they, because that value question does drive what they say are jury questions against Dirksen, they're entitled to a jury question on valuation. And that their expert disagrees, and I know there's this whole area of whether the expert would have really gotten in front of the jury and all that, but spotting them the argument that that expert would have been allowed to testify in front of the jury, then they're saying there's a fact question on valuation that we're entitled to a jury to resolve because we have these legal claims against Dirksen if we didn't waive them by not briefing them fully in this messy process. Your Honor, again, the question whether the inferences from the facts so strongly point in one direction is actually one for this Court. This Court, under Rule 61, engages in harmless, again, spotting them that there was an error as to the jury issue, and I'd like to, in some of my time, turn back to the other reasons why there was no error. But spotting them that there was an error, even if you assume Ms. Taylor would have testified, Ms. Taylor testified, for example, that the market was not informed of a variety of facts about the spinoff. The record showed it was. The jury is not allowed to disregard those facts. They were, just as a, for example, we made this point in our brief, one of Ms. Taylor's contentions, which was very important, was that the market was unaware that the profit margins on the print business, the actual yellow books, was higher than the profit margins on the then pretty nascent Internet business. And the record showed six different disclosures of that very fact. Ms. Taylor had no explanation as to how it is she missed them. The jury would not have been allowed to disbelieve the documents. There was no testimony that the documents were made up after the fact or fraudulent. The jury would have been allowed to disbelieve the documents and believe Ms. Taylor that this fact wasn't disclosed. And things like that, where documents show disclosures, or where Judge Fisch found that allegedly undisclosed facts were immaterial as a matter of law, those are kinds of things that the jury is not permitted to prefer Ms. Taylor's testimony over the papers. So are you saying that had there been a jury sitting there, he would have struck her testimony? Whether he would have struck her testimony or he would have allowed her to testify and then granted a judgment as a matter of law, I can't speculate as to how things would have played out. What I can say is that- You say there would never have been a question going to the jury on value, no matter what. I think that in light of the findings in his post-trial opinion, where he finds unambiguously that Ms. Taylor violated standard valuation methodology in at least two ways. First by double counting, taking the same inputs and using them twice to reduce the valuation of IDR. Second, by taking what was unquestionably an outlier valuation, and Ms. Taylor's valuation using what's called the discounted cash flow methodology, came in that IDR was worth about $5 or $6 billion. No one contemporaneously had a valuation anywhere close. The closest thing a plaintiff can point to on reply is what's called a sensitivity analysis, where you take your actual discounted cash flow and you run a lot of different variables through it that Morgan Stanley did around the time of the spinoff. Morgan Stanley's actual valuation, and I'll get you the page here, it's on page 4116 of the record on appeal, was $12.4 billion. When they ran it through stress testing, and this is on page 4115, the lowest they could come up with was $7 to $8 billion. So $2 billion higher than Ms. Taylor's case. That was their worst possible case scenario. So Ms. Taylor had a complete outlier. And what does standard valuation methodology tell you to do? Not to treat the outlier as the driving force. And yet that's exactly what she did. And Judge Fisch found she violated standard valuation methodology. No more than a chemist who uses the wrong test, who tests for an acid the way you would test for a base, a valuation expert can't violate standard methodology. And he found that she did. The other thing that he found that she did was she didn't fit her analysis to the facts of the case. Again, the stock market showed that IDIRC was worth at least $12.8 billion. Let me just make sure I'm understanding this argument. This argument is that even if there should have been a jury trial, that we are permitted to look at the evidence that was presented at the bench trial and say this evidence wouldn't have been sufficient to go to the jury on value, and therefore it's harmless error. That's your argument. Actually, that's rule 61, directs this court that it cannot or should not reverse a judgment based on an error unless that error is shown to be not harmless. And that's the analysis this court has done in the cases we cited in our briefs. And a review of the record here. And I just want to make sure I'm hearing things correctly. So is your position then that it would have been evidence insufficient to allow a jury to consider and render a verdict, or that no reasonable trial or fact could have rendered a verdict contrary to the judge's finding? It's the latter, Your Honor, which I think tracks the argument. All right. All right. And so a mere scintilla of evidence, and this comes from this court's cases, a mere scintilla of evidence on their side is not enough to get over that threshold. I think given Judge Fish's findings, which we sat through two weeks of their best shot on valuation and found that all that they had was an expert who violated standard methodology, ignored disclosures that led her to disregard entirely the value put on by the public equity markets, that there's nothing there. That there would have been. So there's no, again, spotting Judge Haynes that there is a jury triable claim in this case. There's absolutely no reason to send it back. But there's not a jury triable claim in this case. And even if we get past the arguments where you allow plaintiff to raise the arguments that they didn't raise in their sole reply, right, they asked Judge Fish, let us file a sole reply so we can have the first word on why our three new counts, 9, 10, and 11, are legal and need to be tried to a jury. And they then said not one word about why they're legal. All they said were that the contracts, the spinoff contracts, didn't waive the jury right as to those claims. On reconsideration, they didn't say to Judge Fish, here's why you're hearing a whole host of new arguments from us before. They didn't even tell Judge Fish in their reconsideration motion, you missed that footnote in our brief where we cited Jensen. They waited until their reply to tell him that. And so Judge Fish did not abuse his discretion in finding that they'd waived those arguments or forfeited them. But the contract, the spinoff contracts with clear, unambiguous, all capital letters, bilateral waivers of jury rights, and not just jury rights in suits between Verizon and IDR, and these show up in the IDR's contract with the lenders in the credit and guarantee agreement, but they're written in incredibly broad terms. IDR and Verizon, bilateral, both gave up their right to jury trials on any claims arising out of the spinoff, regardless of the counterparty. Mr. Dirksen signed the distribution agreement as an agent of Verizon. Under the Trascinda case, he's absolutely allowed to invoke that contractual waiver against IDR. And IDR, or the trust standing in the shoes of the debtor, is not allowed to name some of the spinoffs as to which jury rights were waived, and thereby rehabilitate or resuscitate a jury right so that they could take, in their view, all of the claims against Verizon, which, you know, the frauds and transplants are— So that's a problem I have, is it seems like it gives no credit at all to the jury waiver. Assuming that the jury waiver is valid, and I know they have arguments about that, but if you assume it's valid, you're basically letting the tail wag the dog if you say, well, we can bring in this claim against so-and-so, so-and-so over here, and therefore negate all of that. That's absolutely right, Your Honor, and that's, that's our view that, you know, in the Trascinda case from the Third Circuit, it's very clear that you shouldn't let people blow past jury waivers in contracts when that's happened. As for the enforceability of it, the distribution agreement— Let me just ask you on the jury waiver, can we use cases—see, there's cases dealing with arbitration clauses and talking about what order you do stuff in and all of that, but arbitration, you've got this federal policy favoring arbitration, I'm not sure there's a federal policy favoring bench trials. So can we use those arbitration cases to help us understand what we do in a jury waiver case that's not going to arbitration but is going to a, you know, duly constituted, appointed federal judge? I think you can, Your Honor. I think, I agree, there is no comparable statute to the Federal Arbitration Act, the Federal Jury Trial Waiver Act, but this Court has recognized the obvious point that arbitration clauses do waive jury rights, and not only do they waive jury rights, they waive your right to an Article III adjudicator, they more or less waive your rights to appeal before an appellate court, and courts have no problem enforcing those contracts—in the Avial case we said is a prime example of it—in a spinoff context. The distribution agreement is the actual agreement that transferred the business, created this brand-new company. That's an enforceable contract. It contained a clear and unambiguous all capital letters jury waiver clause. If it had been an arbitration clause, I don't think there'd be any question that this case would have had to go to arbitration and wouldn't have been heard in federal court at all. Where a plaintiff instead is able to file a suit, invoke bankruptcy jurisdiction, identify this as a case that's related to the bankruptcy case on the civil cover sheet, I don't see any reason why you can't enforce this provision of the contract the same way all the other provisions of the contract are enforced. Okay, so what about their argument that essentially there wasn't an IDR to agree with? I mean, that's—they've got this argument about there's no brain and all of that, and so therefore you really have an agreement with yourself, and that's not really enforceable. Well, Your Honor, if that were right, then the distribution agreement as a whole would be unenforceable. The entire—I mean, all spinoffs would be impossible, because while you're dealing with a wholly owned subsidiary, you're really just one and the same. All the duties flow up to, in this case, the Verizon shareholders, and so there's only one group that you're working for the best interests of, and the testimony here showed that Verizon shareholders were going to be better off with a Verizon without IDR and IDR on a standalone basis, because in 2006, directories companies were being valued at much higher multiples of their earnings before interest taxes, depreciation, amortization, than Verizon was. And so it really—and this is the testimony of the investment bankers before Judge Fish—that this spinoff really unlocked value for the shareholders, and the evidence showed that the shareholders did, in fact, the day after the spin, have more than they had before, that their shares in Verizon plus their shares in IDR were actually worth more than their shares in Verizon had been the day before, even though Verizon no longer had this $12 billion-plus company within its corporate umbrella. So that's—I mean, that was the spinoff transaction in a nutshell, but because it all, you know, as Anadarko and Westlake Vinyls and Trenwick all recognized, because all of the interests flow up, there's really no other way to have a contract between a parent and a wholly-owned subsidiary. And if I could just take a brief moment on the wholly-owned subsidiary question. To be clear, Judge Fish granted summary judgment as to that fact. At the summary judgment stage, he recognized that the parties actively disputed ownership, although plaintiff had previously taken the position that it was, in fact, a wholly-owned subsidiary, but had actively disputed it, and he found, just as Rule 56G permits him to, where he's denied summary judgment, he applied the summary judgment standard to a disputed fact and found that no reasonable fact-finder could conclude that IDR was other than Verizon's wholly-owned subsidiary. Now, after he made that finding — I mean, does Durexon win as soon as that's decided? I mean, are we kind of done with him then, because then he just owes this sort of general duty to avoid it, not being able to meet his obligations or something like that? Well, that's the one issue. I mean, that's why, even though Judge Fish found that, he found that at the summary judgment stage, there was still a disputed fact, question of fact, as to valuation, because if the subsidiary were insolvent, I mean, you are not allowed to spin off an insolvent subsidiary. There, the creditors do have an interest. But here, and this goes to the question, what's the harm? Creditors invested, in one way or another, about $9.1 billion into this company. In fact, there was so much interest to invest that all of the classes of debt, even the unsecured debt, was substantially oversubscribed. So there was more demand for the debt than available. The interest rates were actually lower than the bankers anticipated. But those companies had IOUs worth $9 billion, $9.1 billion, from a company that was worth $12-plus billion. They weren't harmed in the least by the transaction. And so that's one thing Judge Fish recognized in his post-trial decision. They would say that that's— He just couldn't explain. That's where the valuation comes into the breach of a judiciary claim, and therefore they should get a jury trial on the Dirksen piece, at least. And again, only if they have a preserved argument in favor of the jury demand, and the contracts don't apply. We haven't talked about it briefly, but, you know, to the extent this Court's mandamus decision can be viewed as law of the case, they've got to get over that hurdle as well. There's also, you know, Judge—Mr. Dirksen was encompassed within at least one of the proofs of claim, which was filed at Verizon and its subsidiaries, but also the individuals indemnified by the distribution agreement. Mr. Dirksen was one of those. As a result, we think the Langenkamp doctrine would be a sufficient—would have been, for Mr. Dirksen were going to be necessarily resolved in the claims allowance process. Judge King, as you know, under Section 502D, in order to resolve the proofs of claim that were filed, the fraudulent transfer claims had to be resolved. And at the core of the fraudulent transfer claims is that question of valuation insolvency. Resolving valuation insolvency resolves everything. Again, this is a single allegation. It's a lot of pages. But the allegation is it was an insolvent company. And all of the different counts are just different headings on that basic fact pattern. Because that basic fact pattern had to be resolved under Section 502D, Judge Fish could have used Langenkamp to find that there was no jury trial right as to any claim. He chose not to do that. But it's another alternative ground for concluding that Judge Fish reached the correct result.  Let me ask you this, just straight up. Do we have any cases that tell us when A and B have a waiver of a jury trial and they have key issues amongst themselves, can those be tried first and then if something's left, some guy who has a jury trial right, some guy who may have a jury trial right, and all of this can then be dealt with depending on where we are? I'm not aware of a case that deals with that fact pattern one way or the other. Okay. So one way or the other. So does this fall under the broad discretion of the district court to decide how to organize cases or do we default back to these employment cases about mixing legal and equitable or what do we do with that? I think what we do is we ask ourselves, is there really a claim against Mr. Dirksen as to which a jury demand was made, as to which arguments in favor were preserved? And if they were preserved, do they have a right to that jury trial, not withstanding the contract that Mr. Dirksen signed that contains the jury trial waiver, not withstanding the fact that the core issue, how much was the company worth, is going to be resolved as a result of 502D as part of the claims allowance process. So there are a lot of, and again, the Mandamus issue where this Court, to the extent this Court's law is that Mandamus is the proper approach and at least the Second Circuit and a few other circuits think that to reviewing it, it would be. So I think you have to get past a whole host of things before you even get to that question as to whether the decision to sue an additional person who, they asked for $9 or $14 billion from Mr. Dirksen. The available insurance, which is caps, as Judge Fish found, their remedies against him is in the $200 to $300 million range. And this is very much the case of attempting to use a tail to wag a much larger dog. And if I can just circle back to that. So the claims against Mr. Dirksen are basically breach of fiduciary duty claims counts three and nine, and then the statutory Delaware law unlawful dividend claim. The Perea case that plaintiff cites says that that, like fiduciary duty claims, is a historically equitable claim. And so that's step one under the Grant Financiera test. Under step two, the question is, well, is the remedy that they're seeking, one that is legal or equitable? Now, in the run-of-the-mill case, and Perea was one of the run-of-the-mill cases, they were able to go after the director for the full value of the dividend. That's not true here. In the plan of reorganization, the bankruptcy court, and I mentioned this earlier, struck an equitable balance. Mr. Dirksen, as a former officer, has a right of indemnification against the estate. So any claims brought against Mr. Dirksen are just going to filter back potentially to getting paid out by the estate. So the bankruptcy judge, in order to balance the interest of creditors in finding sources of money to pay off the debts that are, you know, you're getting a haircut in bankruptcy, struck a balance, an equitable balance, and said there's this pool of outstanding money, insurance money, preexisting insurance money, to the extension of claims against IDR's officers and directors, that's your source of remedy. It's not going to be any claim that's indemnifiable against the company. And so these $14 billion claims are really $200 million claims. And I think that where the bankruptcy court has, as an equitable matter, established the limits on the relief, it would be entirely proper for this court to view that remedy in this case, even if not in the run-of-the-mill case, where there is no such limit, where the bankruptcy court hasn't made that balancing, to view that as an equitable remedy. And if we have a historically equitable claim and an equitable remedy, then there's no jury right against Mr. Dirksen as to those claims. The thing that amazes me is, here we are, you know, an hour, we're not yet at an hour, but we've got all this time and space devoted to Mr. Dirksen, and he got a footnote. He didn't even get a footnote, Your Honor. Well, but that's the claim. The footnote just— The claim for today is he got a footnote, and that preserved his argument, which— Well, Your Honor, I'd suggest that you look at the footnote. The footnote in the opposition brief doesn't mention Mr. Dirksen's name. Oh. It just says, we sought money on counts 3 and 4. Therefore, our claim is legal. Citing Jensen, which says just the opposite, says the mere fact that you seek money on a breach of fiduciary duty claim is not sufficient. It's necessary, but not sufficient to make it a legal claim. We had cited a case called Cantor from Delaware holding that even in a case where you seek money, it can well be an equitable claim, and I admit the judge in his first decision overlooked their footnote. And as I mentioned, they didn't point that out to the judge until their reply brief on reconsideration. So that footnote didn't even mention Mr. Dirksen. There was no claim until reconsideration that the counts against Mr. Dirksen were subject to a different analysis or could be viewed differently in any way, shape, or form than the counts against Verizon. So what you're saying we should apply the abuse of discretion standard of review to is Judge Fish's decision to say, look, you guys are good lawyers. You should have briefed it the first time. You didn't brief it. I ain't listening to it the second time. Exactly. Okay. Exactly. And though this was under Rule 54B, he cited, as we pointed out, the right case, which recognizes that judges have broad discretion to grant reconsideration under Rule 54B, broader than under Rule 59 or 60, but that he would, like courts in this district, look to Rule 59 and 60 to guide that discretion and where . . . Well, I mean, you can't keep reconsidering everything you do. Exactly. I mean, I've been a district judge. I get that. Every time somebody's unhappy with you, you can't have them come running in. You just never get anything. You never make forward progress, basically, if you have to constantly reconsider. So I get that. I just am trying to understand your point as to our standard of review, because typically when I hear forfeited error, I think of plain error review, but you're really talking about the judge's ability to manage the docket and say, look, I'm going to listen once. Exactly, Your Honor. And so the abuse of discretion goes to his decision at reconsideration not to consider the new arguments. And if he was right in not considering them, then they're waived or forfeited for purposes of appeal. Okay. I think I've covered everything that was on my list. I've got about two and a half minutes remaining. If the Court has no further questions, I'm happy to sit down, but I'm happy to answer the questions as well. Thank you. Thank you, Your Honor. Judge? I'd like to go to that last point, Your Honor, Judge Haynes, because what he's asking you to do is apply the wrong standard here, because a constitutional right to jury is reviewed de novo. And what he's saying is because a motion for reconsideration was filed, that somehow it transforms the standard into one for abuse of discretion. No, I mean, we have all kinds of constitutional rights in criminal cases and so forth, and we say you've got to brief them, and failing which, you waived them or forfeited them or whatever. I mean, this is not an unheard of. The fact that something's a constitutional right doesn't mean that you can't lose it by your conduct or lack of conduct. I can't lose it for you. Exactly. So we're just trying to get at a judge can run the courtroom and can say, look, I'm not going to listen to the third or fourth motion for reconsideration of the fifth this or that. I need you to make your arguments, and we move on. And unless you have a really good reason, you know, your dog ate the homework or whatever, we're going to move on. And your opponent is saying that's what Judge Fish did here and that he has the discretion to do that. That's the abuse of discretion we're talking about. I understand, Your Honor. But if you go up on appeal, like I cited Fletcher v. Apfel in that case, and it was a summary judgment case, the party moved to reconsider on a legal issue for reconsideration. I only appealed the motion for reconsideration, and this court said that doesn't change the review of the legal question of whether or not the judge was right. And so the question is, was the judge right to strike the jury in this case? And the answer to that question is no for the reasons that we've been talking about. I'd also like to talk a little bit for a minute. He talks about harmless error, and they tried that argument several times with the district court as well. They moved for summary judgment, and it's very interesting if you look at what Judge Fish did when he ruled for the motion for summary judgment. He outlines a lot of the evidence that came in, if not a lot, but summarizes the evidence that ultimately came in at trial. And he said there's a disputed fact issue. It's very clear. He goes through the different reports and the e-mails that are there, and he says, Nope, this is a fact issue. When we closed our case, they got up and moved for judgment as a matter of law. Again, he says, No, there's a fact issue. After it was over, they moved again, renewed their motion for judgment as a matter of law, and said, By the way, go ahead and rule there's no evidence so that the Fifth Circuit will know that this is harmless error, and we can use that in the appeal. Again, he says, No, there was a disputed fact issue. And I don't think that's— Are we bound by that? I mean, that is a question of law. Whether there's evidence that would have been sufficient to go to a jury, since we're looking at the harmless error or not, of not having a jury, that's a question of law. Yes, we give some degree of deference in the sense of we want to know what judge Fisch thought about whether there were facts or not. I agree. And where I was going next was, and then what the record shows is that there's a battle of the experts. You have the— But if an expert relies on just false information, in other words, there were disclosures and the expert says there weren't and so on, I mean, then can we credit that expert even under Dauber? You can't just rely on false evidence. Well, Judge Fisch found her to be highly qualified, and if you compare his— What she did was, she went through, and what she did was went back and used Verizon's own numbers that they had given to Houlihan Loki to do the solvency opinion for the spin-out. That's where she started. And then she made some adjustments, and he weighed the experts and decided which one to believe as a fact finder. But the problem was, there were two problems with what she said. The first problem is she put no weight whatsoever on the price the market put on the stock, which certainly supported a much higher valuation than the one she arrived at. And by the way, it was not just a blip on the screen on the day of first trading, which you can understand, but it was a value that was sustained for quite a while. And the second thing that she did was that— No, wait a minute. The second—I've convinced myself and forgotten the second point. But she had two major flaws in what she was arguing for the valuation here, which I don't know whether it's enough to say that she didn't have a case for the jury. That's a fact question, but I mean— Well, the reason she explained, and she explained that she usually would use the market, but that she was shocked by the difference between the internal discrepancies with what was given the market and what was in the internal market. When the whole plan for the spinoff got hatched, confected, as we say in Louisiana, when it got confected, the valuation that the bankers put on it was $12 billion. And interestingly enough, after the fact, that's the range, within the range— Well, Your Honor, but what happened was they go on the roadshows. They give information to the lenders. The numbers are different than what the internal numbers have been. They don't give them information about the incompetency of the management. They don't— But they made all kinds of disclosures. I mean, was—by the way, were these registered offerings or were these private placements? Private placements. But they—well, if that's the case, then they would have had offering circulars or whatever they call them now that have full—all kinds of disclosures about risk factors in them. And that was what the judge focused on. Okay. Well, I'll give you an example, though. They made a big deal at trial, and they said, okay, the revenues are out there in the market, the declining revenues. The tax-sharing agreement was attached to the Form 10. But here's what one of their in-house people said. I agree with you that this is attached, but the level of information in the It talks about the existence of the tax indemnity. This is the tax-sharing agreement attached to it. It talks about the existence of the tax indemnity, but isn't it all descriptive and linking to what the company can and can't do in the real world, issues like engaging in M&A activity, issuing stock and buying back stock, et cetera. So inside, they're saying this tax-sharing agreement is going to be a problem for IDARC after we spin it off. But we're just not going to say all that. And we have to—we can be careful. We'll say some things, but we're not going to say the true nature of that. The other thing was these private lenders that were doing this, they did their due diligence. They go to the data room. But all the conflicting numbers that Verizon had already done, those had been removed from the data room. So there's some difference there. So you get the numbers for the lenders up, and then what you do is you go out to the public market, and they're going to look at what the lenders rated, the rating agencies did for this debt. So that makes the market go up. And then what other things are not out there? The title defects from—I call them title defects, but the corporate problem— Delaware law problems. The Delaware law problems, which there's cases in our brief that say if the market doesn't know about ownership of the stock or invalidities in title and the like, that does affect commercial value. There are other things that the market didn't know about, the difference between electronic directories. There's some information in the market, but it's not the full extent of the profit margins and how those were going to eat into the print industry. I talked about the TSA. There's difference in the regional markets, and there's also their own valuation that they didn't put out there. So there's lots of evidence in the record, and this is the same evidence Judge Fish was talking about in the motion for summary judgment and even more. So you've got this in there, why not to the market. You've also got other things in the record about value. There's the McKenzie report that confirmed that revenues were declining. There's all the e-mails. There's the management. There's a Morgan Stanley valuation of $7.7 to $8.5 billion. There's the balance sheet. There's balance sheet and solvency. So there's a lot out there to just say this was harmless there and there was no fact issue. Judge Fish spent 66 pages going through the evidence trying to get rid of and discredit the evidence that the plaintiffs had put on for over a week in court. So those are some of the issues. I want to go back to Dirksen for just a second. He didn't file a proof of grant claim, so I don't see how you get there with that. To make him the focal point was really just to show you that he's entitled to a jury, not to minimize the fraudulent transfer claim here does not extinguish the right to a jury in this case. Just the dates on it doesn't work. All the courts and circuits around the country, when they look at this, what that claims resolution process will resolve, necessarily resolve. And the way that they are analyzing that is not the same way that Your Honor is, I don't think. It has to actually be a necessary resolution of the process. One last thing I'd say is I didn't get time to talk about it, but I disagree that the fiduciary duties always run up. The cases that they have on that are subsisting companies where there's a conflict in acting between the subsidiary and the parent company. This spinoff, you don't have that same kind of conflict in your operations that would make you need to defer to the parent company. So that's one point. The valuation finding, Your Honor, and your point is that's critical in the Dirksen case, whether or not it shifts the fiduciary duty or changes it. It's also critical in the damage model. So we think there's a right to a jury trial against Verizon as well, and definitely on fraudulent transfer, the aiding and abetting, the promoter liability. So to just turn this into a Dirksen story is not the way to do it. I just thought that was the easy way to make it clear that we were entitled to a jury. Thank you. Okay. Thank you. There's nothing easy about any of this. I appreciate both sides' arguments. And we are going to take a short five-minute break before taking up the next case.